UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

Joseph P. Ganim,
    *Petitioner*,

      *v.*

United States of America,
    *Respondent.*

Civil No. 3:08cv1759 (JBA)
Criminal No. 3:01cr263 (JBA)

December 30, 2009

RULING ON PETITIONER'S MOTION TO VACATE,
SET ASIDE, OR CORRECT SENTENCE

Petitioner Joseph P. Ganim was convicted by a jury on March 19, 2003 on seven counts for his activities during his tenure as mayor of Bridgeport, Connecticut, for which a 108-month sentence of imprisonment was imposed. His motion under 28 U.S.C. § 2255 attacks these convictions for racketeering, racketeering conspiracy, extortion, honest services mail fraud, bribery, conspiracy to commit bribery, and filing false income tax returns. Mr. Ganim claims principally that he was denied due process because the Government failed to disclose what he surmises were secret side deals made with the Government's two chief cooperating witnesses, Paul J. Pinto and Leonard J. Grimaldi, regarding their criminal financial obligations arising out of charges to which they had pleaded guilty. Mr. Ganim also alleges that the Government failed to disclose that at the time of his trial, Pinto had been under psychiatric care, and that a Government trial witness, Theresa Supple, was the target of an investigation by the U.S. Attorney's office. Mr. Ganim argues that these alleged failures by the Government constitute violations of *Brady v. Maryland*, 373 U.S. 83 (1963), and

*Giglio v. United States*, 405 U.S. 150 (1972).  Because Petitioner's claims lack legal and factual merit, his motion will be denied.

I.      Background[1]

Mr. Ganim was mayor of Bridgeport from 1991 to 2003, when he was convicted. "[Mr.] Ganim developed close relationships with [cooperating witnesses] Grimaldi and Pinto over the years that followed" his first election.  *United States v. Ganim*, 510 F.3d 134, 137 & n.2 (2d Cir. 2007).  In exchange for Pinto's and Grimaldi's cooperation in its investigation and prosecution of Mr. Ganim, the Government negotiated plea agreements and cooperation agreements with both.  Through Grimaldi and Pinto's testimony, the Government adduced evidence that Mr. Ganim awarded privatization contracts to, and took favorable action toward, entities represented by either Grimaldi or Pinto, and required the entities to pay high fees to Grimaldi and Pinto with the understanding that part of the fees would be passed on to Mr. Ganim to get his approvals.  Grimaldi and Pinto used a portion of these "fees" to support Mr. Ganim's lavish entertainment preferences and to otherwise benefit him.  *See generally Ganim*, 510 F.3d at 137–40.  Mr. Ganim also required that

---

[1] The Court assumes the reader's familiarity with the factual and procedural background of this case, and provides only a brief summary here.  For a fuller account, see *United States v. Ganim*, 225 F. Supp. 2d 145 (D. Conn. 2002) (denying motion to dismiss indictment); *United States v. Ganim*, No. 3:01cr263(JBA), 2003 WL 21516581 (D. Conn. Jun. 30, 2003) (denying renewed motion for judgment of acquittal); *United States v. Ganim*, No. 3:01cr263(JBA), 2006 WL 1210984 (D. Conn. May 5, 2006) (denying motion for resentencing), *aff'd*, 256 F. App'x 399 (2d Cir. 2007); *United States v. Ganim*, 510 F.3d 134 (2d Cir. 2007) (affirming conviction).

Grimaldi use a portion of these fees to employ Mr. Ganim's wife, overpaying her and in cash. *Id.* at 138.

Before the guilty verdict Mr. Ganim orally moved for a Judgment of Acquittal (Case No. 3:01cr263, Doc. # 149 (Feb. 25, 2003)), which the Court denied on June 30, 2003 (*see id.* at Doc. # 214).  Mr. Ganim filed his Notice of Appeal on July 17, 2003 (*id.* at Doc. # 225), and filed his appeal brief on July 20, 2006.[2]  The conviction was affirmed in 2007.  *Ganim*, 510 F.3d at 152.

## II.     The Government's *Brady* and *Giglio* Obligations

The "due process rights as declared in *Brady* . . . and its progeny, *e.g.*, *Giglio*," *United States v. Douglas*, 525 F.3d 225, 244 (2d Cir. 2008), are violated "when the government fails to disclose evidence materially favorable to the accused," *Youngblood v. West Virginia*, 547 U.S. 867, 869 (2006) (citing *Brady*, 373 U.S. at 87).  "Thus, . . . '[t]here are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the [prosecution], either willfully or inadvertently; and prejudice must have

---

[2] Because the Court disposes of Mr. Ganim's petition on other grounds, it does not reach the Government's argument that the petition is procedurally barred because Mr. Ganim could have raised these issues on direct appeal because his post-trial discovery of the bases pre-dated his Second Circuit briefing.  The Government's argument is that Mr. Ganim could have added the documents he obtained post-trial to the record on direct appeal by moving under Rule 33 for a new trial.  It bears noting that there is no published authority requiring claims-exhaustion via Rule 33 to preserve them for appeal.  *See, e.g.*, *United States v. Moronta–Garcia*, No. 1:92cr234(CSH), 1995 WL 23549, *2 (S.D.N.Y. Jan. 20, 1995).

ensued.'" *Douglas*, 525 F.3d at 244–45 (quoting *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)). "[E]vidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different,'" which is demonstrated "upon a 'showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Youngblood*, 547 U.S. at 870 (quoting *Strickler*, 527 U.S. at 280, and *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)).

III.    Claims

    A.    Secret Side Deals Between Government and Pinto and Grimaldi

Mr. Ganim's chief argument is that the reduction of Pinto's forfeiture obligation from $400,000 to $4,869.70 and the dismissal of the $175,000 forfeiture count against Grimaldi—each of which occurred after Mr. Ganim's conviction—reflect the execution of what he alleges are undisclosed side deals between each of them and the Government that existed at the time of Mr. Ganim's trial. Thus, Mr. Ganim surmises, the Government knowingly permitted Pinto and Grimaldi to testify falsely at trial regarding the penalties each faced. In support of his theory, Mr. Ganim points to an escrow agreement between Pinto and the Government (Pinto Escrow Agreement, Ex. H[3]), which he argues was not provided to him in the Government's disclosures in violation of *Brady* and which reflects the Government's secret agreement with Pinto that the escrowed funds would be disbursed in

---

[3] Exhibits labeled by letter are attached to Petitioner's Memorandum in Support of his Motion under § 2255 [Doc. # 1-1]. Exhibits labeled by number are attached to the Government's Opposition [Doc. # 9].

4

satisfaction of his fines, penalties, restitution "*and*" forfeiture, rather than "*or*" forfeiture, as stated in the disclosed plea agreement.

> 1.   *Plea Agreements, Testimony, and Sentencing of Pinto and Grimaldi*

In June 2001 Pinto pleaded guilty to conspiracy to violate RICO, mail fraud, tax fraud, and a criminal forfeiture count.  He agreed to certain criminal financial obligations, including federal tax liability estimated to be $300,000, an unspecified amount of restitution, and forfeiture of approximately $400,000 which represented his interest, or anticipated revenues from his sale of his interest, in two properties in Fairfield, Conn.  He and the Government also agreed that he was subject to a fine of up to $1 million.  (*See* Pinto Plea Agmt., Ex. F; Pinto Guilty Plea Tr., Ex. X.)[4]  The plea agreement specified that all funds would be deposited in an escrow account.[5]  In June 2001 Grimaldi pleaded guilty to conspiracy to violate RICO and tax fraud as well as a criminal forfeiture count.  Grimaldi agreed to certain criminal financial obligations, including an unspecified amount of federal tax liability, an unspecified amount of restitution, and forfeiture of approximately $175,000,

---

[4] Specifically, Pinto and the Government agreed that to satisfy his criminal financial obligations he would forfeit two properties, one on Fairfield Beach Road and the other at Burrwood Common, both in Fairfield.  Pinto and the Government agreed that Pinto would forfeit $75,000 from the proceeds from sale of the Burrwood Common property, with "the balance of [his] equity in the [Burrwood Common] property [to] be applied against [his] 1997–2000 federal income tax liability."  They estimated that Pinto's interests in the properties, "less the amount to be applied toward [Pinto's] tax liability, is worth approximately $400,000," and that Pinto would forfeit this amount, either by direct forfeiture of the properties or by payment of $400,000 in cash.  (Pinto Plea Agmt. at 3–4; Pinto Guilty Plea Tr. at 18, 23–24, 48.)

[5] (*See* Pinto Cooperation Agmt., Ex. I, at ¶ 6; Pinto Escrow Agreement, Ex. H; Letter from Gov't to Richard Meehan, Ex. M, at 1, 3, 5; Apter Aff., Ex. 8, at ¶¶ 5–6; Sklaire Aff., Ex. 9, at ¶¶ 5–7.)

comprised of his $25,000 bank account and his interest, or anticipated revenues from his sale of his interest, in a property in Redding, Conn.  He and the Government also agreed that he was subject to a fine, which could be over $1 million.  (*See* Grimaldi Plea Agmt., Ex. C; Grimaldi Guilty Plea Tr., Ex. D.)

During Mr. Ganim's criminal trial, Grimaldi and Pinto each testified about the terms of their agreements with the Government.  Grimaldi testified that he had pleaded guilty to a "[r]acketeering conspiracy and tax fraud" as well as to a forfeiture count in the amount of $175,000 plus restitution.  He testified that he faced up to imprisonment for 20 years for the RICO violation and three years for tax fraud.  He acknowledged "a forfeiture provision in which I agreed to turn over . . . a total of $175,000" derived from a bank account containing $25,000 as well as "$150,000 from the proceeds of the sale of the house" in Redding; that his "restitution to the people of the [C]ity of Bridgeport . . . would be determined by the Court;" that the sums agreed to in his plea agreement did not cover any potential tax liability; that he had a cooperation agreement with the Government stating that he would be prosecuted for perjury if he did not testify truthfully in grand juries and criminal trials, and otherwise cooperate fully with the government; and that as of the time of Ganim's trial he had already forfeited the $175,000.  On cross-examination Grimaldi testified that he knew that in addition to imprisonment he was "exposed to a substantial fine as well," and that by cooperating with the Government he avoided being charged with a number of other crimes.  He also agreed that his forfeiture count specified less than one-fifth of what he estimated to be his gains from the RICO conspiracy.  (*See* Trial Tr. at 405–06, 1221–22, 405–10, 413–15, 1221–24, 1282–83, 5010–11.)

Pinto testified at Mr. Ganim's criminal trial that he had pleaded guilty to "a four-count information" charging him with a RICO conspiracy, mail fraud, income tax fraud, and criminal forfeiture. As to the forfeiture count, Pinto testified that he sold the two properties in Fairfield (i.e., the Fairfield Beach Road and Burrwood Commons properties) as well as "other assets in order to pay over and hand over to the [G]overnment the proceeds from the illegal activities." He testified that at the time of trial he had already forfeited "[a]bout $400,000," which "represent[ed] the money that [he] made improperly and illegally." He further testified that he was subject to imprisonment for 20 years for the RICO charge, five years for the mail fraud count, and three years for the tax fraud count, and that "[i]n addition to those penalties," he was "required to make restitution to the city of Bridgeport" in an amount that would later be determined by the Court and was also required to pay, but had not yet paid, approximately $200,000 in back taxes and late penalties. He also acknowledged that he was subject to a fine of up to "twice the gross gain to [him]self resulting from the [RICO] offense," which was "up to $4 million." He further testified about his cooperation agreement with the Government "to tell the [G]overnment all the information about [his] illegal activities and the activity of others, to cooperate fully with the investigation, to testify if [he is] called upon to testify, and to be truthful and honest with all [his] information that [he] tell[s] the [G]overnment," in hopes of receiving leniency at sentencing. (*See* Trial Tr. at 4248–57, 5001, 5800–04.)

Pinto agreed that the Government could have charged him with far more counts than it did in fact charge him with, and testified that if he "fail[ed] to tell the truth" the Government would "throw[] out" the cooperation agreement and could prosecute him for perjury in addition to counts not listed in the four-count Information. He also agreed that

7

his forfeiture count specified less than one-fifth of what he estimated to be his gains from the RICO conspiracy. He agreed that he had expected approximately $325,000 from selling the Fairfield Beach Road property and $75,000 sale of the Burrwood Commons property, which proceeds would be forfeited to the Government, but that because his sale of the Fairfield Beach Road property actually netted only approximately $220,000, and he "had to put money in to close th[e] sale" of the Burrwood Common property, he had to liquidate other assets to satisfy his $400,000 forfeiture obligation. He testified that after doing so, by the time of trial he "really [did]n't have any assets other than the house that [his] wife owns," on which the Government had placed a lien which could obligate him "to sell the house in order to pay [his] debts." (*See* Trial Tr. at 5002–12, 5803–06.)

Four months after the guilty verdict was rendered against Mr. Ganim, the Court sentenced Pinto and Grimaldi. Consistent with the plea agreements reached with Pinto and Grimaldi, the Government moved for downward departures from applicable Sentencing Guideline ranges based on their substantial assistance to the Government in its investigation and prosecution of Mr. Ganim. On July 24, 2003 the Court imposed on Grimaldi a 14-month sentence of incarceration and a $75,000 fine. The Court also imposed joint and several liability on Grimaldi, Pinto, Ganim, and two others "to pay restitution of $136,000 to Bridgeport Energy," and required Grimaldi to "cooperate with the Internal Revenue Service to pay all outstanding back taxes, interest and penalties." (Grimaldi Judgment, Ex. 5; Case No. 3:01cr131, Doc. # 39 (July 24, 2003).) On July 17, 2003 the Court imposed on Pinto a 24-month sentence of incarceration, a $100,000 fine, joint and several liability on

8

Pinto and others[6] "for restitution in the amount of $316,700.00 to the City of Bridgeport," joint and several liability on Pinto and others[7] "for restitution in the amount of $104,000 to the City of Bridgeport," and joint and several liability on Pinto, Grimaldi, Ganim, and another "for restitution in the amount of $136,000.00 to Bridgeport Energy." The Judgment specified:

> Total restitution owed is $556,700.00.   Restitution in the amount of $265,000.00 is due immediately which will be taken from the defendant's escrow account.   Defendant shall pay a fine of $100,000.00 which will be taken from defendant's escrow account and the remainder shall be forfeited to the USA. . . . Defendant shall cooperate with Internal Revenue Service in the payment of all back taxes, interest and penalties currently $479,251.00.

(Pinto Judgment, Ex. O; Case No. 3:01cr130, Doc. # 37 (July 17, 2003).)

In the twenty-nine months following Grimaldi's and Pinto's guilty pleas, the Government moved a number of times to deposit funds—some derived from the sales of Grimaldi's and Pinto's properties and liquidations of their accounts—into an interest-bearing escrow account.[8] On July 17, 2003 the Government moved for an order disbursing

---

[6] For this restitution joint and several liability was imposed on Pinto, Alfred Lenoci, Jr., Patrick Coyne, Scott Arena, and Brian Bannon.

[7] For this restitution joint and several liability was imposed on Pinto, Alfred Lenoci, Jr., and Fales Trucking.

[8] On November 17, 2003 the Government cataloged all payments made into the escrow fund by name, date of payment, amount of payment, and the object of distribution of each payment.   The accounting reflected 32 payments between September 14, 2001 and November 13, 2003 totaling $1,990,716.76 made by eleven people and one company: Scott Arena, Brian Bannon, Patrick Coyne, Fales Trucking, Ganim, Grimaldi, Alfred Lenoci, Jr., Alfred Lenoci, Sr., Pinto, Michael Schinella, Frank Sullivan, and Mark Trinkley.   (*See* Gov't's Mot. Disbursement, Nov. 17, 2003, Exs. P and 3, at Att. A.)   Seven of these payments were made on behalf of Grimaldi and Pinto.   (*See id.*; *see, e.g.*, Gov't's Motions to Deposit Funds, Ex. K (Dec. 7, 2001; $150,000 on behalf of Grimaldi), Ex. L (Mar. 6, 2002; $133,000 on behalf

9

some of these escrowed funds in satisfaction of Grimaldi's "fine imposed by the Court" ($75,000) and his "criminal tax liability" ($104,895).[9]  Four months later, on November 17, 2003, the Government moved to disburse the remaining $851,685.68 "in satisfaction of the defendants' joint and several restitution obligations, criminal fines and other financial obligations," including restitution to the City of Bridgeport and Bridgeport Energy, the fines owed by Grimaldi and Pinto, Grimaldi's IRS tax liability, and other monetary obligations.[10] The Court entered a Forfeiture Order on January 24, 2004 forfeiting to the Government "the right, title, and interest to $4,869.70," in satisfaction of Pinto's forfeiture count of conviction. (Ex. Q.)  Eighteen months later, on July 12, 2005 and in response to a query from the Clerk, the Government moved to dismiss the forfeiture count against Grimaldi and delete references in his judgment to the forfeiture count in order to "'conform'" Grimaldi's sentence "'to the term which the record indicates was intended'" since "both the record and the actual sentence clearly indicate the Court's intent that the sentence not include any

---

of Pinto), Ex. 14 (Sept. 17, 2001; $236,440.48 on behalf of Pinto), and Ex. 15 (Aug. 27, 2002; $29,980.00 on behalf of Pinto).)

[9] (Gov't Mot. Disbursement, July 17, 2003, Ex. R; *see also* Gov't Mot. Disbursement, Nov. 17, 2003, Exs. P and 3, at 2 n.3 (noting $180,645.44 in "payments and interest credited to Mr. Grimaldi" and accounting for application of this sum to his "tax liability" and his "fine" as well as "forfeit[ure] to the United States" of the remaining "balance of $750.44").)

[10] Specifically, the Government sought payments of $430,170.54 as "[r]estitution to City of Bridgeport," $136,000.00 as "[r]estitution to Bridgeport Energy," $100,000.00 "[t]o be credited to Pinto's fine," $75,000.00 "[t]o be credited to Grimaldi's fine," $104,895.00 "[t]o be credited to Grimaldi's IRS tax liability," and $5,620.14 "[t]o be forfeited to the United States."  According to the Government, after these payments neither Grimaldi nor Pinto would have any remaining unpaid criminal monetary obligations.  (Gov't Mot. Disbursement, Nov. 17, 2003, Exs. P and 3, at 1, 5.)

forfeiture penalty." (Gov't's Mot. Dismiss Grimaldi Forfeiture Count, Ex. S (quoting *United States v. Kaye*, 739 F.2d 488, 490 (9th Cir. 1984)); Kopel Aff., Ex. 19, at ¶ 2.)  This motion was granted.  (Ex. T.)

### 2.   Disclosure of the Pinto Escrow Agreement

The Government's failure to provide Mr. Ganim with a copy of the Pinto Escrow Agreement is not a *Brady* violation because the Government disclosed to Mr. Ganim the existence of the escrow agreement almost seventeen months before trial in its *Giglio* document list.  As well, Pinto's cooperation agreement—which was produced—references the Pinto Escrow Agreement.  (*See* Pinto Cooperation Agmt., Ex. I, at ¶ 6; Letter from Gov't to Richard Meehan, Ex. M, at 1, 3, 5.)  "*Brady* cannot be violated if the defendant[] had actual knowledge of the relevant information," *United States v. Zigari*, 111 F.3d 307, 320 (2d Cir. 1997), and "evidence is not considered to have been suppressed within the meaning of the *Brady* doctrine if the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of [that] evidence," *United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir. 1995).  Although the Government's pre-trial *Giglio* disclosure letter directed to Mr. Ganim's counsel did not include a copy of the escrow agreement, clearly Mr. Ganim's counsel had notice of its existence.   Under the circumstances, the Government cannot be said to have suppressed the agreement by having failed to provide an actual copy to accompany disclosure of its existence.  *See also United States v. Zackson*, 6 F.3d 911, 919 (2d Cir. 1993) (no *Brady* violation where despite non-disclosure defendant "was nevertheless aware that the issue [addressed by non-disclosed material] may have warranted some additional investigation").

### 3.    Existence of Side Deals

As discussed below, Mr. Ganim relies on three circumstances in support of his surmise that side deals existed between the Government and Grimaldi and Pinto: (1) the unproduced escrow agreement is the only document stating that Pinto's payment of $400,000 would satisfy all of his criminal financial obligations; (2) the Government's motions under seal to deposit funds into, and disburse funds from, an escrow account; and (3) the discrepancy between (a) the dollar amounts specified in the forfeiture counts against Grimaldi and Pinto and (b) the Government's dismissal of the forfeiture count against Grimaldi and the greatly reduced amount it required from Pinto as forfeiture.[11]

Mr. Ganim argues that the secret side deal between Pinto and the Government is manifested by the Pinto Escrow Agreement's language stating that the $400,000 Pinto would pay would satisfy his restitution, criminal tax liabilities, "*and*" forfeiture, while the Plea Agreement stated it would satisfy his restitution, criminal tax liabilities, "*or*" forfeiture. This argument is unavailing because the escrow agreement was not suppressed. Moreover, the escrow agreement used both the conjunctive ("and") and the disjunctive ("or") to describe

---

[11] Beyond these circumstances, Mr. Ganim provides no evidence of any secret side deal between the Government and either Pinto or Grimaldi, and his assertion that these secret side deals exist is not based on his or anyone else's personal knowledge. Since nothing is offered to augment the written submissions of the parties or rebut the affidavits attached to the Government's memorandum, "a hearing would not offer any reasonable chance of altering [the Court's] view of the facts." *Chang v. United States*, 250 F.3d 79, 86 (2d Cir. 2001). Therefore, an evidentiary hearing at which live testimony may be received is unnecessary. *See id.*

the relationship between Pinto's payments and his criminal financial obligations, i.e., restitution, tax liability, and forfeiture.[12]

In any event, at least until the witnesses' sentencings, the Government and counsel for both Pinto and Grimaldi were of the understanding that both witnesses were liable for the amounts specified in their forfeiture counts of conviction. Each of the two Assistant U.S. Attorneys who were trial counsel in *United States v. Ganim* submit unrebutted affidavits which aver that:

> The Government had no unwritten 'side deals,' understandings, promises or agreements with Mr. Pinto or Mr. Grimaldi on any issues. Specifically, there were no agreements or understandings with Mr. Pinto or Mr. Grimaldi—at any time—that their forfeiture obligations, as memorialized in their plea agreements, would later be forgiven, or that the monies paid by Mr. Pinto and Mr. Grimaldi in satisfaction of their forfeiture obligations would be used to pay the other financial obligations outlined in their respective plea agreements.
>
> . . .
>
> I understood that the ultimate disposition of the escrowed funds would be decided by the district court at the time of sentencing.

(Apter Aff., Ex. 8, at ¶¶ 4, 8; Sklaire Aff., Ex. 9, at ¶¶ 4, 8.)   Other government officials involved in the investigation and prosecutions of Ganim, Grimaldi, and Pinto—as well as Pinto's and Grimaldi's counsel—also aver that no unwritten side deals exist or existed between the Government and Pinto or Grimaldi. (Wethje Aff., Ex. 10, at ¶ 4 (IRS agent);

---

[12] The Escrow Agreement stated that in light of "the intention of the parties that" the Fairfield Beach Road and Burrwood Common properties "shall be used to satisfy, in whole or in part, any restitution, criminal tax liability *or* forfeiture ordered by" the Court, Pinto, and the Government "d[id] covenant and agree . . . that the proceeds derived from the sale or transfer of [those two properties] shall be used to satisfy the obligations of Paul J. Pinto, including restitution, criminal tax liability *and* forfeiture."  (Pinto Escrow Agreement, Ex. H, at 1–2 (emphases added).)

Adams Aff., Ex. 11, at ¶ 4 (lead case agent for the FBI); Pickerstein Aff., Ex. 12, at ¶ 5 (Pinto's counsel); Cowdery Aff., Ex. 13, at ¶ 5 (Grimaldi's counsel).)

Similarly, the letters under whose cover counsel for Grimaldi and Pinto sent checks to be deposited in the Court's Registry reflect that before and during Mr. Ganim's trial, counsel's understanding was that the funds would be used to satisfy the witnesses' forfeiture obligations.[13] This understanding that Pinto and Grimaldi would pay the sums specified in their forfeiture counts persisted well beyond the conclusion of Mr. Ganim's criminal trial on March 19, 2003.  Counsel for Pinto believed "going into sentencing" four months later that the $400,000 in escrow would not "be allocated for purposes other than forfeiture" (Pickerstein Aff. at ¶ 15), and counsel for Grimaldi believed even after his client's sentencing on July 24, 2003 that the $175,000 Grimaldi had paid was in satisfaction of his forfeiture obligations (Cowdery Aff. at ¶¶ 10–13).  The Court's colloquy with Pinto's counsel at Pinto's sentencing further reflects this understanding.  (*See* Pinto Sentencing Tr., Ex. B, at 4 (noting that it was counsel's "understanding" that Pinto's criminal forfeiture conviction would "follow[] from the other three" counts to which he pleaded guilty).)  The same is true of the Court's colloquy with Grimaldi's counsel.  (*See* Grimaldi Sentencing Tr., Ex. A, at 31 (noting that it was counsel's "understanding" that in addition to "restitution to Bridgeport Energy for $136,000, . . . Grimaldi ha[d] placed . . . the proceeds from his forfeitures in the amount of $175,000 in an escrow account with the court.").)

---

[13] (*See, e.g.*, Gov't's Motion to Deposit $29,980 on behalf of Pinto, Ex. 15, at Att. A (notation by Pickerstein that "funds are subject to forfeiture"); Cowdery Aff., Ex. 13, at ¶¶ 6–7 (noting that checks in amount of $25,000 and $150,000 were in satisfaction of forfeiture).)

That the Court thereafter deemed Pinto's forfeiture obligation to be satisfied by $4,869.70 and later dismissed Grimaldi's forfeiture count does not demonstrate that at the time of Petitioner's trial either Pinto or Grimaldi expected these dispositions or that an agreement existed between the Government—which took no position at Pinto's and Grimaldi's sentencings on the matter of their forfeiture obligations[14]—and Pinto and Grimaldi. *Cf. United States v. Molina*, 75 F.3d 600, 602 (10th Cir. 1996) (the Government's post-trial favorable treatment of witnesses "is not evidence that" agreements of such favorable treatment "were secretly reached prior to the witnesses' testimony and improperly withheld from the defense.").[15]

Moreover, even if an agreement had been made between the Government and the witnesses after trial and by the time of their sentencings that the escrowed $400,000 would satisfy Pinto's restitution and tax liabilities in addition to his forfeiture obligation, and that the Government would move to dismiss Grimaldi's forfeiture count, these agreements would post-date Mr. Ganim's trial, and therefore would not be *Giglio* material because no "promise to [a] witness" made *after* a witness's testimony can give rise to a *Giglio* violation. *DeMarco v. United States*, 415 U.S. 449, 450 (1974) (emphasis added) (question of whether agreement "between the witness and the Government . . . was made *after or before* petitioner's trial . . . was dispositive" of the *Giglio* claim).

---

[14] (*See* Apter Aff. at ¶ 22; Sklaire Aff. at ¶ 22)

[15] Mr. Ganim's assertion that the Government improperly permitted Pinto and Grimaldi to testify falsely as to the nonexistence of side deals thus lacks merit.

### 4.    *Materiality of Side Agreements and Escrow Agreement*

Mr. Ganim's argument must also be rejected because even were there to have been agreements (which he has not shown) and even if the Government's failure to provide a copy of the Pinto Escrow Agreement constituted its suppression (which it does not), neither the side agreements nor the failure to produce the escrow agreement, independently or considered together, caused prejudice.  Pinto and Grimaldi were extensively examined and cross-examined about the terms of their plea agreements, and each described multiple times the context in which they were testifying against Petitioner as well as the substantial benefits, including financial benefits, they were to receive from the Government.  Each testified that under his plea agreement he was liable for only a small fraction of the total financial liability (in fines, restitution, and forfeiture) the Government could have sought to have imposed on him if he stood trial, and that in exchange for his cooperation the Government agreed to consider asking the Court to reduce the prison sentence he was otherwise facing on the charges to which he had pleaded guilty.  Moreover, each testified about the financial consequences of the penalties for the crimes to which he had pleaded guilty.  They both testified that to satisfy their financial obligations they sold their real property holdings.  Pinto testified that he was left with almost no assets: after selling the Fairfield Beach Road and Burrwood Common properties, he told the jury, he had almost nothing left except a house in his wife's name, on which the Government had placed a lien.  Grimaldi testified that he had to sell his own home to satisfy his $175,000 obligation.  Each testified that if he testified falsely the Government could prosecute him for perjury.  Pinto's and Grimaldi's testimony regarding the lenient treatment they stood to receive from the Government in exchange for their testimony, as well as the contingent nature of that leniency, revealed an

16

extensively negotiated relationship between the Government and each witness. In this context, the additional fact that the sums to which each had testified would satisfy the *entirety* of their financial obligations, and not just their forfeiture obligations, would have been, at most, "cumulative of equally impeaching evidence introduced at trial," and thus "not material." *United States v. Spinelli*, 551 F.3d 159, 165 (2d Cir. 2008) (citing *United States v. Avellino*, 136 F.3d 249, 257 (2d Cir. 1998)). Thus, Mr. Ganim could not meet "this stringent materiality standard," *id.*, and his claim under *Brady* and *Giglio* must be rejected.

B.     Pinto's Psychiatric Treatment

Based on a reference in Pinto's sentencing memorandum to a psychiatrist's report offered in aid of sentencing, Mr. Ganim concludes that Pinto underwent psychiatric treatment before or at the time of his trial, and that this undisclosed impeachment evidence constitutes a *Brady* violation. In advance of his sentencing hearing Pinto argued:

> As was noted by Dr. [David] Preven in his report, "Mr. Pinto was dazzled by Mr. Ganim's intelligence, energy and commitment to his goals." He was dazzled by Mr. Ganim's taste for fine clothes, fine wine, and expensive lifestyle. Whether it was his youth, his vulnerability, or the fact that he was simply seduced by power and money, Pinto set off on an odyssey with Ganim and others that was to take him down a road of criminality the extent of which he failed to appreciate until it was too late.

(Pinto's Prelim. Sentencing Mem., Ex. 20, at 15.)

This report constitutes no evidence that Pinto had seen a psychiatrist before or during Mr. Ganim's trial. Not only did Pinto state to the Court at his guilty plea colloquy on June 13, 2001 that he was not and had not recently been "under the care of any physician or psychiatrist" (Ex. T at 8), but his counsel avers that Pinto "was not under the care of a psychiatrist at the time of the trial in *United States v. Ganim*," and in fact "has never been under the care of a psychiatrist" (Ex. 12 at ¶ 16). Pinto's counsel further avers that "[i]n

17

preparation for [Pinto's] sentencing, [counsel] asked that [Pinto] be evaluated by Dr. David Preven, a psychiatrist," who "interviewed Mr. Pinto and produced a report, dated April 30, 2003." (*Id.* at ¶ 17.) Further, because the report itself did not exist until after Mr. Ganim's trial, the Government obviously could not have turned it over before or during that trial, and thus the psychiatric evaluation it contained is not information that may form the basis of a *Brady* or *Giglio* claim. *See, e.g.*, *United States v. Sanchez*, 251 F.3d 598, 603 (7th Cir. 2001) (rejecting claim that Government violated *Brady* by failing to disclose information that did not exist at the time of the petitioner's trial, and explaining that "because the [G]overnment cannot suppress evidence that does not exist at the time of the trial, there is no *Brady* violation").[16]

> C.     Government's Investigation of Theresa Supple

Theresa Supple, a supervising project manager employed by the Connecticut Department of Public Works ("DPW"), testified for the Government at Mr. Ganim's trial about the plans of the State of Connecticut and City of Bridgeport to exercise their eminent domain authority to "condemn property owned by B.C. Sand & Gravel [("B&C")] in order to build a juvenile detention facility." *Ganim*, 510 F.3d at 139 (recounting facts). Mr. Ganim claims that federal authorities had been investigating corruption in the DPW at the time of the Ganim trial, and that "Supple was a key witness, if not a potential target, of [the Government's] investigation" (Pet'r's Mem. Supp. at 23, 52–53), quoting a May 2003

---

[16] Mr. Ganim's reliance on *Leka v. Portuondo*, in which the Second Circuit observed that "*Brady* requires disclosure of information that the prosecution acquires during the trial itself, or even afterward," 257 F.3d 89, 100 (2d Cir. 2001), is misplaced because the Government cannot violate the Due Process Clause by failing to disclose information that does not actually exist at the time of trial, *see DeMarco*, 415 U.S. at 450; *Sanchez*, 251 F.3d at 603.

newspaper report of Supple's suicide stating that "'[s]tate and federal authorities said Supple could have provided valuable assistance to the FBI by giving them a road map to how the contracts were awarded in'" two projects, including the one in Bridgeport (*id.* (quoting newspaper article (Ex. U))).   Mr. Ganim concludes that "Supple's role in the . . . investigation" was impeachment evidence because it shows that she "would be highly motivated to testify favorably for the Government at [P]etitioner's trial," and was therefore "*Brady* material that should have been disclosed to [P]etitioner."   (*Id.*)

Mr. Ganim's argument is unavailing because Supple was in fact a relatively minor witness in Ganim's trial whose testimony did not link him to any criminal conduct, and was in any event corroborated by the testimony of B&C principal Kenneth Burns.   Therefore, even assuming Supple had a role in the Government's investigation of DPW that predated the conclusion of Mr. Ganim's trial, the Government's failure to disclose that role was not material.

Supple testified that in early 1999 Mr. Ganim was in favor of exercising eminent domain over the B&C property, so the State let the City "step[] forward" on the project. (Trial Tr. at 6608.)   At a well-attended April 1999 meeting, however, public opposition to the project was "vehement[],"[17] and in May 1999 Supple learned that Mr. Ganim had decided to have the City "ceas[e] the acquisition or the eminent domain proceedings" because condemning the property would harm Bridgeport businesses (*id.* at 6612, 6614, 6681, 6683 (protection of businesses was Mr. Ganim's only stated rationale for opposing acquisition of

---

[17] (Trial Tr. at 6612, 6614, 6644–46 (describing public opposition on cross-examination); *id.* at 6655–57 (describing correspondence between State and B&C on cross-examination); *id.* at 6664 (testifying that public opposition was a subject of discussion among State and City officials at September 1999 meeting).)

B&C property)), and thereafter the State and the City "effectively reversed roles," with the State now taking the lead on the eminent domain proceedings (*id.* at 6616).  After further negotiation, Supple testified, the State agreed "to look elsewhere as a possible site for the juvenile detention center," with Mr. Ganim's opposition to the B&C site "an important factor" in the State's decision because of the fact that the center's construction plan had contemplated a City–State partnership.  (*Id.* at 6625; *see also id.* at 6626, 6660–61 (Supple testifying that State would not acquire property if City opposed acquisition).)  Supple testified that the City and State agreed in September 1999 to use their eminent domain authority to acquire a parcel adjacent to the B&C property housing "an empty building" rather than the property containing businesses including B&C.  (*Id.* at 6667.)

But it was B&C principal Kenneth Burns, not Supple, who testified that he paid Pinto $100,000 for Mr. Ganim to oppose the acquisition.  Burns testified regarding the dates and substance of the meetings throughout 1999, his relationship and fee arrangement with Pinto, his knowledge of Pinto's "close" relationship with Mr. Ganim, and his crediting Pinto with State and City decisions to locate the juvenile detention center on a different site.  (*Id.* at 6242–61, 6266–68, 6275–80.)  After the City and State agreed to acquire a different parcel, B&C paid Pinto the $100,000, which Pinto shared with Ganim.  *See generally Ganim*, 510 F.3d at 139–40 (describing this arrangement).

Because Supple did not testify as to any arrangements, illegal or otherwise, that Mr. Ganim had with Pinto or B&C—indeed, she testified that she had never met or dealt with Pinto—and because Burns both corroborated the facts to which Supple testified and also provided the testimony supporting a conclusion that Mr. Ganim opposed condemnation of the B&C property in exchange for sums paid by B&C to Pinto, Supple's testimony was of no

critical "importance" to Mr. Ganim's conviction, and was in any event corroborated by Burns. Supple did not provide *any* "evidence linking the defendant[] to the crime," let alone the "only" such evidence. *See Spinelli*, 551 F.3d at 165. Therefore, even assuming there was, at the time of Mr. Ganim's trial, "undisclosed information which could have served to impeach" Supple, Mr. Ganim has failed to support the possibility that Supple's role in the DPW investigation—even assuming it predated the end of his criminal trial[18]—could meet the "stringent materiality standard" of *Brady* and its progeny. *Id.*

D.    Summary

Mr. Ganim's assertions that his conviction at trial was obtained in violation of *Brady* and *Giglio*—by virtue of (1) the Government's failure to produce a copy of the Pinto Escrow Agreement; (2) his unsupported speculation that secret side deals existed between the Government and each of its two key witnesses that the Government failed to disclose them; (3) his unsupported speculation that Pinto was under undisclosed psychiatric care before or during his trial; and (4) his position that the Government's investigation of a minor witness

---

[18] In a sur-reply the Government contends that this information did not exist at the time of Mr. Ganim's trial because "the Government first became aware of allegations involving Supple through an attorney proffer on March 21, 2003, two days after the jury returned its verdict in the Ganim case." (Gov't Sur-Reply [Doc. # 18] at 2.) Petitioner has moved to strike the sur-reply because "the Government did not notify [P]etitioner or seek counsel's consent," and instead filed the sur-reply "without leave of the Court." (Pet'r's Mot. Strike [Doc. # 20] at 2.) The Government counters that its sur-reply does "not change [its] position on Ganim's claim[s]," but only "clarif[ies] the record." (Gov't Reply [Doc. # 21] at 1, 3.) The Court's publicly available Chambers Practices expressly state that sur-replies are "not usually allow[ed]." The Court did not give the Government leave to file a sur-reply, and the Government cites no authority for the proposition that reiteration of a position and clarification of a record provide grounds to file a sur-reply absent leave of the Court. Petitioner's Motion to Strike the Sur-reply will be granted, and the Court does not rely on the sur-reply in considering Mr. Ganim's petition.

should have been disclosed—must be rejected because they present no merit.  The Pinto Escrow Agreement was not suppressed, the secret side deals did not exist, and Pinto was not under psychiatric care before or during Petitioner's trial; and even "considered collectively," *see Kyles*, 514 U.S. at 436, the agreement, side deals, fact of Pinto's psychiatric care, and undisclosed investigation of Supple fail "to undermine confidence in the verdict," *Youngblood*, 547 U.S. at 870 (internal quotations omitted), that Mr. Ganim was guilty of the seven crimes of which he was convicted.

IV.   Conclusion

For the reasons stated above, Petitioner's Motion to Strike the Government's Sur-Reply [Doc. # 20] is GRANTED, and Petitioner's Motion to Vacate, Set Aside, or Correct Sentence [Doc. # 1] is DENIED.  The Clerk is directed to close this case.


IT IS SO ORDERED.


/s/
_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 30th day of December, 2009.